**In re GENERAL DEVELOPMENT CORP., et al., Debtors.**

**Bankruptcy No. 90–12231–BKC–AJC.**

United States Bankruptcy Court, S.D. Florida.

March 15, 1995.

---

William J. Perlstein, Wilmer, Cutler & Pickering, P.A., Washington, DC, Kenneth B. Robinson, Mark D. Bloom, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, FL, for debtor.

Samuel J. Zusmann, Jr., Michael G. Williamson, Maguire, Voorhis & Wells, P.A., Orlando, FL, for Official Committee of Unsecured Creditors.

James P. Paul, Special Representative, Haley, Sinagra & Perez, P.A., Miami, FL, for Lot and Home Purchasers.

Robin Suarez, Tallahassee, FL, for Florida Div. of Land Sales.

A. JAY CRISTOL, Chief Judge.

## THE FINAL DECREE of G.D.C.[1]

A chapter 11 petition was filed on April 6, 1990 and it appearing:

There are strange things done in the Florida sun
by the men who moil for gold.
G.D.C. sales had their secret tales
that would make your blood run cold.
Bankruptcy fans have seen big plans
but one of the biggest they ever did see,
was at the end of the second year, when hope did appear,
and we reorganized G.D.C.

G.D.C. had its roots in nineteen twenty, in Detroit, Michigan.
Chemical Research Syndicate was formed, oil refining was the plan.
The Mackle Company started in Miami, in about the year 1948.
The Mackle Brothers built a bunch of homes that people said were great.
As the land boom grew, they knew what to do, they developed planned communities.
They gained fame far and wide, it was justified, and they never missed opportunities.

By 1954 Chemical wanted more and with partner, Yellowknife Bear,
they formed Florida West Coast Land which bought its Florida share.
Over eighty thousand acres in Charlotte County and Sarasota,
joined with three other subsidiaries and began to sell their quota.
A deal was made with Mackle Company for fifty-fifty ownership.
A new name was picked, GENERAL DEVELOPMENT, it really was a pip.

In 1955 another subsidiary, Port Charlotte, Inc. came to be.
In 1956 the Chemical—Mackle subsidiaries merged into G.D.C.
By year 58 things were going great, they still built houses quite well.
In a proper way they built roads and canals that everyone thought were swell.

---

1. With apologies to Robert W. Service and Sam McGee.

Things were going so good, they thought they should, and no one thought it strange,
that in that same year they were listed on the American Stock Exchange.
Later that year, the price was not dear, so they made a deal quite juicy.
For stock they got 6,000 acres that soon became Port St. Lucie.

The Mackle brothers did all the building, they had a deal exclusive.
But the joy they knew, of the right thing to do, eventually became elusive.
In 1962 the Mackle boys were through, they resigned and left the board.
Why they left I don't know, but they really did go, perhaps they just got bored.

Along came a crew, entirely new, smart and from the big city.
Straight shooting, no need, the new goal was greed, and what happened next was a pity.
"If it ain't broke don't fix it," they didn't know, no matter that things were fine.
They began a new game, that's known by the name, of "what's on the bottom line."

In '66 G.D.C. put in the fix, and moved to the New York Stock Exchange.
No more building good houses, and no more selling fine lots, the smart folks saw need for a change.
Soon all their attention was away from production, their eyes could only lock,
On the Dow Jones Average, the latest trade and the closing price of the stock.

By the year 79, things still seemed fine, they had sold over 148,000 acres.
More than three times Manhattan, take your pipe and put that in, they were really movers and shakers.
But the chase for the buck, caused a change in their luck, and a Federal investigation.
When the Feds dug in deep, to that moldering heap, it boggled their imagination.

The indictment was filed, the public was riled, the company copped a plea.
They agreed to restitute, but it didn't mean a hoot, it was the end for G.D.C.
They had no money to pay, there was no other way, they filed for Bankruptcy.
And that's how the trail, of this incredible tale, ultimately came to me.

And what a case, in no other place, was there filed a case more vast.
330,000 creditors needed to receive notice, and fast.
The order was tall, to get to them all, noticing was in languages nine,
Mailed to five continents, with my compliments, it worked out fine.
Then in came the names, signed on the claims, each day it looked like a million.
When all was said and done, we didn't miss a one, and in dollars they totaled five billion.

A new team came in, the chances looked thin, to save anything for tomorrow.
The banks wanted theirs now, they didn't care how, and it looked like there was no place to borrow.
But funds they did find, (the banks changed their mind) I detected a slight change in the weather.
Debtor's lawyers had the will and with magnificent skill, they got everyone working together.

They had to explain, in language quite plain, that the pie that was left was too small.
They tried to do right, with all of their might, but everyone could not have it all.
So they did what was fair, with what they had there, and put a plan on the table.
They said, "its the best we can do, we are telling you true, Judge, please confirm it, if you're able."

Almost everyone agreed, that the plan did exceed, what at first we thought we could do.
No one ignored it, almost everyone voted for it, and so the reorganization went through.
Almost no one got all, almost no one got none, and most folks think it was fair.
The concern is going today, in a much better way, I know because I was there.

> There are strange things done in the Florida sun
> by the men who moil for gold.
> G.D.C. sales had their secret tales
> that would make your blood run cold.
> Bankruptcy fans have seen big plans
> but one of the biggest they ever did see,
> was at the end of the second year, when hope did appear,
> and we reorganized G.D.C.

---

Based upon the foregoing, the Court finds that the Second Amended Plan of Reorganization of General Development Corporation (the "GDC Plan") as confirmed by Court Order dated March 27, 1992, has been substantially consummated in that it has been represented by counsel that creditors have received a substantial portion of the distribution of stock, notes and cash to which they are entitled. The Court notes that there may be a further redistribution of stock and notes, as well as continuing payments of cash to certain creditors. The Court finds that these continuing obligations do not prevent the Court from entering a final decree. The Court also notes that there may remain outstanding matters in this case which may require additional court intervention. Based upon the retention of continuing jurisdiction, the Court does not believe the issuance of a final decree will prevent the Court from considering such matters upon application by interested parties. Accordingly, it is

**ORDERED:** that

1. The administratively consolidated chapter 11 cases of the above named debtor are closed and the Clerk of the Court shall take appropriate steps to reflect the same in the records of the Court. The Clerk shall, however, retain and not ship to archives all files in this case until one year from the date of this Order;

2. That the law firm of Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A. is excused from filing a final fee application, and shall hereafter be discharged and excused from the requirement of filing any future fee applications with the Court;

3. That notwithstanding the closing of this case, the Court will retain continuing jurisdiction to hear and determine:

a) All matters pertaining to the allowance and disallowance of claims and interests and the fixing of the secured, unsecured and administrative portions of any claims;

b) All matters pertaining to distributions under the GDC Plan, including without limitation matters pertaining to the recirculation of any distributions which are unclaimed due to the fact that creditors cannot be located. Any money due to creditors pursuant to the plan of reorganization and remaining unclaimed must be held in accordance with 11 U.S.C. 347(b) and 11 U.S.C. 1143.

c) All matters pertaining to the reduction or maintenance of any claim reserves;

d) All matters which pertain to or arise under or in connection with any appeals from orders entered by the Court, including without limitation the appeals involving (i) the Florida Department of Revenue (11th Cir., Case No. 94–4418); (ii) County Tax Collectors (U.S.D.C., Case No. 94–0040–CIV–ARONOVITZ); (iii) John and Mildred Sipes (U.S.D.C., Case No. 94–0095–CIV–ARONOVITZ); and (iv) Lillian Skolnick (U.S.D.C., Case No. 93–0597–CIV–MOORE).

e) All matters pertaining to the receipt, use or application of any condemnation proceeds obtained by Atlantic Gulf and/or General Development Utilities, Inc., including without limitation any matter which relates to conflicting claims against such condemnation proceeds;

f) All matters pertaining to or arising under or in connection with the utility trusts created or implemented pursuant to the GDC Plan, including without limitation the Class 14 Utility Fund Trust Agreement, Division Class 14 Utility Fund Trust Agreement, Homesite Program Utility Fund Trust Agreement and Improvement Fund Trust Agreement;

g) All matters pertaining to or arising from the creation of Section 365(j) liens, including without limitation matters arising from the Section 365(j) liens trust mortgage, the release of any properties from such mortgage, as well as the transfer of any 365(j) liens to other properties owned by Atlantic Gulf;

h) All matters pertaining to or arising under or in connection with the Homesite Purchaser Assurance Program (including, but not limited to, the Land Trust Agreements), as well as the calculation of termination refunds upon the termination of agreements covered by the Homesite Program;

i) All matters pertaining to or arising under or in connection with the *Say* and/or *Acampora* class settlements;

j) All applications filed by Atlantic Gulf pertaining to chapter 11 debtor Oxford Finance Companies, Inc. and its business practices as they may affect former GDC homesite purchasers and GDC Homesite Purchase Agreements which are governed by orders entered by this Court;

k) All matters pertaining to the enforcement of all orders entered by the Court including the March 27, 1992 Confirmation Order;

l) All matters pertaining to any tax issues arising under the GDC Plan or with respect to the implementation thereof;

m) All matters pertaining to adversary proceeding *Eileen Tonge v. The Prudential Insurance Co. of America*, Case No. 91–1171–BKC–AJC–A; and

4. That Atlantic Gulf shall be excused from the requirement of filing a final report setting forth all distributions which it has made pursuant to the GDC Plan, but shall file a report as to all professional fees paid during the course of this case; and

5. That service of this Final Decree upon all Notice Parties shall be deemed good and sufficient service.

**DONE AND ORDERED.**